**SARA M. PELOQUIN**
California State Bar No. 254945
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467, Ext. 3716
Facsimile: (619)687-2666
sara_peloquin@fd.org

Attorneys for Mr. Jose Agusto Perez-Ramos

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(**HONORABLE JANIS L. SAMMARTINO**)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>JOSE AGUSTO PEREZ-RAMOS<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 08CR0539-JLS<br><br>Date: June 6, 2008<br>Time: 1:30 p.m.<br><br>STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MR. PEREZ-RAMOS' MOTIONS. |

**I.**

**STATEMENT OF FACTS**[1]

On February 18, 2008, immigration agents arrested Mr. Perez-Ramos on suspicion of violating 8 U.S.C. § 1326. The material produced thus far by the government indicates that on February 18, 2008, Border Patrol Agent Nguyen first confronted and interrogated Mr. Perez-Ramos regarding his immigration status, approximately four miles west of San Ysidro and forty yards north of the border. This entire interrogation proceeded any form of administration of Miranda rights by the agents by approximately two hours. Mr. Perez-Ramos was held for prosecution. On February 27, 2008, the January 2007 Grand Jury returned a one count indictment charging Mr. Perez-Ramos with illegal re-entry after deportation in violation of 8 U.S.C. § 1326 (a) and (b).

[1]Facts referred to are based on information provided by the government. Mr. Perez-Ramos does not admit their accuracy and reserves the right to contest them.

According to information provided by the government in discovery, on July 16, 2007, an Immigration Judge (IJ) ordered Mr. Perez-Ramos deported pursuant to deportation proceedings after finding that he was deportable from the United States. See Exhibit C (order of the immigration judge). The IJ order indicates that Mr. Perez-Ramos was deportable on the charge alleged in the Order to Show Cause (OSC). The OSC alleges that Mr. Perez-Ramos was deportable for being in violation of Section 212(a)(6)(A)(i) of the Immigration and Nationality Act (INA) for having entered the United States without being admitted or paroled. See Exhibit D (Order to Show Cause).

The IJ never advised Mr. Perez-Ramos that he was eligible for any forms of relief. See Exhibit E (transcript of deportation hearings). Mr. Perez-Ramos informed the IJ that he is the father of five United States Citizen children. See Exhibit E. He told the IJ that the children's mother, his long-time girlfriend was a United States Citizen, whom Mr. Perez-Ramos wanted to marry. See Exhibit E. The IJ never advised Mr. Perez-Ramos that he may be eligible for a waiver of inadmissibility under Section 212(h) of the INA, nor that with that waiver, Mr. Perez-Ramos could apply for adjustment of status. See Exhibit E. In fact, the IJ affirmatively misinformed Mr. Perez-Ramos that "because of this conviction it doesn't appear that there is anything that you can do." See Exhibit E, pg. 1. The IJ simply found Mr. Perez-Ramos deportable as charged and ordered him removed to Mexico. See Exhibit E.

## II.

## THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING MR. PEREZ-RAMOS OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY

### A. Introduction.

The indictment in the instant case was returned by the January 2007 grand jury. See CR at 6.[2] That grand jury was instructed by Judge Burns on January 11, 2007. See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A. Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases

[2] "CR" refers to the Clerk's Record in Case Number 07CR2364-LAB.

challenging a form grand jury instruction previously given in this district in several ways.[3] These instructions compounded Judge Burns's erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A. See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[4]

**1. Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. A at 3, 3-4, 5,[5] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id. at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'" See id. at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to an instance in the grand juror selection process in which it excused three potential jurors. See id. at 8.

> I've gone over this with a couple of people. You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

---

[3] See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

[4] The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury. Mr. Perez-Ramos requests that the video presentation be produced. See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

[5] See also id. at 20 ("You're all about probable cause.").

Id. That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their disagreement with Congress. See id. at 8-9. Thus, the Court not only instructed the grand jurors on its view of their discretion; it enforced that view on pain of being excused from service as a grand juror.

Examination of the recently disclosed voir dire transcript, which contains additional instructions and commentary in the form of the give and take between Judge Burns and various prospective grand jurors, reveals how Judge Burns's emphasis of the singular duty is to determine whether or not probable cause exists and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire. In one of his earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8. In this passage, Judge Burns twice uses the term "should" in a context makes clear that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that the person that they propose that we indict committed the crime."

Equally revealing is Judge Burns's interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause. Because of the redactions of the grand jurors' names, Mr. Perez-Ramos will refer to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources. See id. at 16. The CSW was also troubled by certain unspecified immigration cases. See id.

Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this

district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling. Rather, Judge Burns provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment. If there's probable cause, then the case should go forward. *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell me that.

See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, Judge Burns let the grand juror know that it would not want him or her to decline to indict in an individual case where the grand juror "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause. See id. Such a case "should go forward." See id. Given that blanket proscription on grand juror discretion, made manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence warranted it." See id. Again, Judge Burns's question provided no context; it inquired regarding "a case," a term presumably just as applicable to possession of a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any grand juror listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit them to vote "no bill" in the face of a showing probable cause.

Just in case there may have been a grand juror that did not understand his or her inability to exercise anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA. REA first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding "medical marijuana." See id. at 24. Judge Burns first sought to address REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into account.

> Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that. We want you to make a business-like decision of whether there was a probable cause. . . .

Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id. That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand juror is obligated to vote to indict if there is probable cause.

> I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make. But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed. It's not for me to say, "well, I don't like it. So I'm not going to follow it here."
>
> You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your prerogative is here. You're prerogative instead is to act like a judge and say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation to indict in every case in which there was probable cause.

> The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
> REA: It would depend on the case.
> The Court: Is there a chance that you would do that?
> REA: Yes.
> The Court: I appreciate your answers. I'll excuse you at this time.

Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, Judge Burns made no effort to explore REA's views; it did not ascertain what sorts of cases would prompt REA to hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to indict

because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[6] See id. at 27. That is why even the "chance," see id., that a grand juror might not vote to indict was too great a risk to run.

**2. The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.**

In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex. A at 20.[7]

---

[6] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate judge will have determined the existence of probable cause "in most circumstances" before it has been presented with any evidence. See Ex. A at 6. This instruction created an imprimatur of finding probable cause in each case because had a magistrate judge not so found, the case likely would not have been presented to the Grand Jury for indictment at all. The Grand Jury was informed that it merely was redundant to the magistrate court "in most circumstances." See id. This instruction made the grand jury more inclined to indict irrespective of the evidence presented.

[7] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general. Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you." See Ex. A at 27. The instructions delivered during voir dire go even further. In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying. They make sense to me." See id. at 43. See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys. See Ex. A at 9-10. Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, Judge Burns would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. A at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence*.

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge." See id.

**B. Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[8] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion. That is not the institution the Framers envisioned. See United States v. Williams, 504 U.S. 36, 49 (1992).

For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

---

[8] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510 (1978)). Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial." ). See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor." Id. See Niki Kuckes, The Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure § 15.2(g) (2d ed. 1999)).

Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth in Vasquez v. Hillery, 474 U.S. 254 (1986). See id.

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis of the same facts. And, significantly, the grand jury may refuse to return an indictment even "'where a conviction can be obtained.'"

Id. (quoting Vasquez, 474 U.S. at 263). The Supreme Court has itself reaffirmed Vasquez's description of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls not only the initial decision to indict, but also significant questions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263). Judge Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor has established probable cause that this individual has committed a crime." See id. at 1214 (Hawkins, J. dissenting). Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J., dissenting). In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit. But not in Judge Burns's instructions.

**C. Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established in Both Vasquez and Navarro-Vargas II.**

The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision in Marcucci. Marcucci reasoned that the instructions do not mandate that grand jurors indict upon every finding of probable cause because the term "should" may mean "what is probable or expected." 299 F.3d at 1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge Hawkins ably pointed out. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence."). See also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American Diction and Language Guide 1579 (1999) (brackets in original)).

The debate about what the word "should" means is irrelevant here; the instructions here make no such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not choose not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...." See Ex. A at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess "the need to indict." Vasquez, 474 U.S. at 264.

While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether an indictment was required if probable cause existed, see Ex. B at 4, 8, in context, it is clear that Judge Burns could only mean "should" in the obligatory sense. For example, when addressing a prospective juror, Judge Burns not only told the jurors that they "should" indict if there is probable cause, it told them that if there is not probable cause, "then the grand jury should hesitate and not indict." See id. at 8. At least in context, it would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205. Clearly Judge Burns was not.

The full passage cited above effectively eliminates any possibility that Judge Burns intended the Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8. Of the two sentences containing the word "should," the latter of the two essentially states that if there is no probable cause, you *should* not indict. Judge Burns could not possibly have intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159). That would contravene the grand jury's historic role of protecting the innocent. See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination whether there is probable cause and the protection of citizens against unfounded criminal prosecutions.") (citation omitted).

By the same token, if Judge Burns said that "the case should move forward" if there is probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then Judge Burns would have to have intended two different meanings of the word "should" in the space of two consecutive sentences. That could not have been his intent. But even if it were, no grand jury could ever have had that understanding.[9] Jurors are not presumed to be capable of sorting through internally contradictory instructions. See generally United States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory:

**(1)** The first occasion occurred in the following exchange when Judge Burns conducted voir dire and excused a potential juror (CSW):

---

[9] This argument does not turn on Mr. Perez-Ramos' view that the Navarro-Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible. Rather, it turns on the context in which the word is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

> The Court: . . . If there's probable cause, then the case should go forward. I wouldn't want you to say, "Well, yeah, there's probable cause. But I still don't like what the government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that's your frame of mind, then probably you shouldn't serve. Only you can tell me that.
> Prospective Juror: Well, I think I may fall in that category.
> The Court: In the latter category?
> Prospective Juror: Yes.
> The Court: Where it would be difficult for you to support a charge even if you thought the evidence warranted it?
> Prospective Juror: Yes.
> The Court: I'm going to excuse you then.

See Ex. B at 17. There was nothing ambiguous about the word "should" in this exchange with a prospective juror. Even if the prospective juror did not like what the government was doing in a particular case, that case "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that. See id. ("I wouldn't want you [to vote against such a case]"). The sanction for the possibility of independent judgment was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to the exercise of discretion by any other prospective grand juror.

**(2)** In an even more explicit example of what "should" meant, Judge Burns makes clear that it there is an unbending obligation to indict if there is probable cause. Grand jurors have no other prerogative.

Court . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."

> You'd have a similar *obligation* as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of Congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your *prerogative* is here. Your prerogative instead is act like a judge and to say, "All right. This is what I've got to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27. The potential juror responded: "It would depend on the case." Id. Nevertheless, that juror was excused. Id. at 28. Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise." This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case." Thus, it is clear that Judge Burns's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many. But Judge Burns did not pursue the question of what factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to indict.

**(3)** As if the preceding examples were not enough, Judge Burns continued to pound the point home that "should" meant "shall" when it told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws here." See id. at 61.

**(4)** And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when it reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the penalties to which indicted persons may be subject.

> Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.
> The Court: In what regard?
> Prospective Juror: Specifically, medical marijuana.
> The Court: Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that.* We want you to make a business-like decision of whether there was a probable cause. ...

See Ex. B at 24-25 (emphasis added). A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in Marcucci. See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006). Cortez-Rivera is inapposite for two

reasons. First, Judge Burns did not use the term "should" in the passage quoted above. Second, that context, as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera. The instructions again violate Vasquez, which plainly authorized consideration of penalty information. See 474 U.S. at 263.

Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there was probable cause. These instructions go far beyond the holding of Navarro-Vargas and stand in direct contradiction of the Supreme Court's decision in Vasquez. Indeed, it defies credulity to suggest that a grand juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in Vasquez:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts. Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See id. at 264. Judge Burns's grand jury is not Vasquez's grand jury. The instructions therefore represent structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand jury proceeding." See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must therefore be dismissed. Id.

The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the instructions excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may

have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it independent." Id. at 1202 (emphases in the original).

Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting). The flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond making a probable cause determination ... unconstitutionally undermines the very structural protections that the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described in Vasquez. Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions because nothing will happen if they disobey them." Id.

In setting forth Judge Hawkins' views, Mr. Perez-Ramos understands that Judge Burns may not adopt them solely because the reasoning that supports them is so much more persuasive than the majority's sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

Here, again, the question is not an obscure interpretation of the word "should", especially in light of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not only that.

Judge Burns did not limit itself to denying the grand jurors the power that Vasquez plainly states they enjoy. He also excused prospective grand jurors who might have exercised that Fifth Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See Ex. A at 8; Ex. B at 17, 28. The structure of the grand jury and the secrecy of its deliberations cannot embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience of the community. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches of government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d

1061, 1066 & n.6 (D.C. Cir. 1969)). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both fashioned his own rules and enforced them.

**D. The Instructions Conflict with Williams' Holding That There Is No Duty to Present Exculpatory Evidence to the Grand Jury.**

In Williams, the defendant, although conceding that it was not required by the Fifth Amendment, argued that the federal courts should exercise their supervisory power to order prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment common law. See 504 U.S. at 45, 51. Williams held that "as a general matter at least, no such 'supervisory' judicial authority exists." See id. at 47. Indeed, although the supervisory power may provide the authority "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by Judge Burns and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." Id. at 47 (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure." Id. at 50. As a consequence, Williams rejected the defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law. See id. at 51-55.

Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex. A at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See id. at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." See Navarro-Vargas, 408 F.3d at 1207.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true. It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20. Thus, once again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." See id. Moreover, during voir dire, Judge Burns informed the jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. *They have a duty to do that*." See Ex. B at 14-15 (emphasis added). Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See Ex. A at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1) I have to consider evidence that undercuts probable cause.

(2) The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

(3) Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

## III.

## MOTION TO DISMISS THE INDICTMENT DUE TO AN INVALID DEPORTATION

### A. Summary of Argument

On December 1, 2006, Immigration and Customs Enforcement (ICE) commenced deportation proceedings against Mr. Perez-Ramos. The IJ presiding over Mr. Perez-Ramos' deportation hearing in 2007 ordered him deported under Section 212(a)(6)(A)(i) of the Immigration and Nationality Act. Mr. Perez-Ramos' due process rights were violated at his 2007 deportation hearing.

The immigration judge (IJ) failed to advise Mr. Perez-Ramos of a form of relief for which he was eligible. Namely, the IJ misadvised Mr. Perez-Ramos as to his eligibility for relief by filing an application for adjustment of status pursuant to INA Section 245. The IJ did not advise Mr. Perez-Ramos that he could have waived his ground of inadmissibility (his alleged criminal conviction) by applying for a waiver of that ground under INA Section 212(h).[10] Had Mr. Perez-Ramos been advised by the IJ that he could adjust his status pursuant to INA Section 245, he very likely could have been approved as a beneficiary of an approved visa petition which would have allowed for his immediate immigration to the United States. Mr. Perez-Ramos could have applied for adjustment of status for being the parent of a U.S. citizen who would have (and indeed, did) suffer extreme hardship upon Mr. Perez-Ramos' deportation.

The failure to advise Mr. Perez-Ramos of potential relief from deportation violated his due process rights. This due process violation prejudiced Mr. Perez-Ramos because it is “plausible” that he would have been granted a waiver of inadmissibility under INA Section 212(h) and become eligible to apply for an

[10] Persons who are inadmissible under the grounds relating to moral turpitude offenses, drug offenses of 30 grams or less of marijuana, prostitute and commercialized vice, five year sentence for two convictions, and foreign diplomats asserting immunity from prosecution can apply for a waiver under INA Section 212(h).

adjustment of status under INA Section 245. As there is no other deportation the government may rely on in prosecuting him, Mr. Perez-Ramos moves this Court for an order dismissing the indictment.

**B. The 2007 Deportation May Not Serve as the Basis of a § 1326 Prosecution**

"A defendant charged with illegal reentry under 8 U.S.C. § 1326 has a Fifth Amendment right to collaterally attack his removal order because the removal order serves as a predicate element of his conviction." United States v. Ubaldo-Figueroa, 364 F.3d 1042, 1047 (9th Cir. 2004) (citing United States v. Mendoza-Lopez, 481 U.S. 828, 837-38 (1987)). To "sustain a collateral attack under § 1326(d), a defendant must, within constitutional limitations, demonstrate (1) that he exhausted all administrative remedies available to him to appeal his removal order, (2) that the underlying removal proceedings at which the order was issued improperly deprived him of the opportunity for judicial review, and (3) that the entry of the order was fundamentally unfair." Id.

**1. Mr. Perez-Ramos is Exempt From § 1326(d)'s Exhaustion Requirement**

Normally, a defendant charged with violating § 1326 who wishes to collaterally challenge his removal must have exhausted any administrative remedies available to him. See 8 U.S.C. § 1326(d)(1). However, a person eligible for relief from removal who is *not* advised by an IJ of a potential basis from relief is "exempted from the exhaustion requirement" of § 1326(d). United States v. Ortiz-Lopez, 385 F.3d 1202, 1204, (9th Cir. 2004) (quoting Ubaldo-Figueroa, 364 F.3d at 1047, (9th Cir. 2004)). Here, as discussed below, the IJ never advised Mr. Perez-Ramos of his eligibility for relief in the form a Section 212(h) waiver of the ground of inadmissibility and adjustment of status. This failure to inform Mr. Perez-Ramos of his eligibility for relief exempts Mr.Perez-Ramos from the "exhaustion requirement" of § 1326(d). Ortiz-Lopez, 385 F.3d at 1204.

**2. Mr. Garcia was Denied Judicial Review**

Similarly, the IJ's failure to inform Mr. Perez-Ramos of his eligibility for relief under INA Section 245 and Section 212(h) deprived him of an opportunity to seek judicial review of the IJ's removal order. Ortiz-Lopez, 385 F.3d at 1204; Ubaldo-Figuroa, 364 F.3d at 1049-50. A defendant seeking to collaterally challenge a deportation under § 1326(d) must show that he was improperly denied the opportunity for judicial review. See 8 U.S.C. § 1326(d)(2). An IJ's failure to inform a person of their eligibility for voluntary

removal satisfies the requirement that a defendant be denied his opportunity to seek judicial review. Ortiz-Lopez, 385 F.3d at 1204; Ubaldo-Figuroa, 364 F.3d at 1049-50.

**3. Mr. Perez-Ramos' Deportation Was Fundamentally Unfair**

To successfully challenge the government's use of a prior removal in a § 1326 prosecution, a defendant must show that the entry of that removal order "was fundamentally unfair." 8 U.S.C. § 1326(d)(3). "An underlying removal order is 'fundamentally unfair' if: '(1) [a defendant's] due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects.'" Ortiz-Lopez, 385 F.3d at 1204 (quoting United States v. Zarate-Martinez, 133 F.3d 1194, 1197 (9th Cir. 1998)).

**i. Mr. Perez-Ramos's deportation violated due process because the immigration judge failed to inform him of his eligibility for relief from removal.**

As noted above, "[a]n underlying removal order is 'fundamentally unfair' if: (1) [a defendant's] due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects.'" Ubaldo-Figueroa, 364 F.3d at 1048 (quoting Zarate-Martinez, 133 F.3d at 1197). To establish prejudice, Mr. Perez-Ramos does not have to show that he would have been granted relief. Instead, he need only show that he had a "'plausible' ground for relief from deportation." Id. at 1050 (citing Arrieta, 224 F.3d at 1079). Furthermore, as noted previously, although Mr. Perez-Ramos carries the initial burden on the issue of prejudice, once Mr. Perez-Ramos makes a prima facie showing of prejudice, the burden shifts to the government to demonstrate that the procedural violation could not have changed the proceedings' outcome. Gonzalez-Valerio, 342 F.3d at 1054 (emphasis added).

In answering these questions, the Court is *not* to put itself in the shoes of the immigration judge before whom Mr. Perez-Ramos appeared in 2007—the immigration judge who failed to advised Mr.Perez-Ramos as to *any* relief he was eligible for. A long line of cases from the Supreme Court on down make clear that this Court's determination is much different. The only question before the Court is whether *an* immigration judge reasonably could have granted Mr. Garcia relief in 1995. See, e.g., St. Cyr, 533 U.S. 289, Ubaldo-Figueroa, 364 F.3d 1042, Leon-Paz, 340 F.3d 1003. While there may be no case explicitly defining "plausible" in this context, Webster's Third New International Dictionary 1736 (1993), defines "plausible" as "superficially fair [or] reasonable . . ." and "superficially worthy of belief." This is, of course, a much

lower and less discretionary standard than Mr. Perez-Ramos would have faced in immigration court. If Mr. Perez-Ramos has made a prima facie showing of prejudice, and the government has not proven that his claim would have been dismissed without some consideration, then this Court must grant Mr. Perez-Ramos' motion. See, e.g., Gonzalez-Valerio, 342 F.3d at 1054 (discussing the government's burden).

**ii. Mr. Perez-Ramos was eligible for an adjustment of status and a waiver of inadmissibility under I.N.A. § 212(h).**

A noncitizen can immigrate to the United States if he meets certain criteria, through adjustment of status to permanent residence. See 8 U.S.C. § 1255. To be eligible for adjustment of status a person must be within the United States and must be the beneficiary of an approved visa petition which allows for immediate immigration. Id. Adjustment of status is not precluded for someone with a criminal record as long as the person is admissible to the United States or is eligible for a waiver of inadmissibility. Id.

Mr. Perez-Ramos could have applied for an adjustment of status with a waiver of inadmissibility pursuant to INA Section 212(h). Persons who are inadmissible to the United States under the grounds relating to aggravated felonies can apply for a waiver of this ground of inadmissibility pursuant to INA Section 212(h). See 8 U.S.C. § 1182(h)(1)(B). This waiver can be granted in deportation proceedings *nunc pro tunc* to waive deportability for having been inadmissible at last entry, even if no adjustment application is filed. See Matter of Sanchez, 17 I. & N. Dec. 218 (BIA 1980).

Mr. Perez-Ramos was eligible for a waiver of his ground of inadmissibility, as charged by the immigration service, because he is the parent of five United States citizen children and Mr. Perez-Ramos' removal would have caused severe hardship to those children. See 8 U.S.C. § 1182(h)(1)(B). Further, Mr. Ramos could have married the United States Citizen mother of his children. She could have petitioned for him, resulting in an immediately available visa. Mr. Ramos could have obtained a waiver of inadmissibility under § 212(h) and adjusted his status to that of a lawful permanent resident.

As Mr. Perez-Ramos was eligible for adjustment of his status at the time of his deportation proceeding under 8 U.S.C. § 1255. , the IJ's failure to inform him of this eligibility violated his due process rights. Moran-Enriquez v. INS, 884 F.2d 420, 422 (9th Cir. 1989); United States v. Arce-Hernandez, 163 F.3d 559, 563 (9th Cir. 1999); United States v. Arrietta, 224 F.3d 1076, 1079 (9th Cir. 2000).

### iii. Mr. Perez-Ramos suffered prejudice at his removal hearing.

Mr. Perez-Ramos suffered prejudice as a result of this due process violation. To demonstrate prejudice at his removal hearing, Mr.Perez-Ramos "does not have to show that he actually would have been granted relief. Instead, he must only show that he had a 'plausible' ground for relief from deportation." Ubaldo-Figueroa, 364 F.3d at 1050 (internal citation omitted). Once a defendant has made a prima facie showing of prejudice, it is the government burden "'to demonstrate that the procedural violation could not have changed the proceedings' outcome.'" United States v. Gonzalez-Valerio, 342 F.3d 1051, 1054 (9th Cir. 2003); see also Ortiz-Lopez, 385 F.3d at 1205 (quoting same).

### 4. Mr. Perez-Ramos Had Plausible Grounds for Relief *As a Matter of Law*.

In determining whether Mr. Perez-Ramos' circumstances may have moved an immigration judge to grant him discretionary relief, this Court is held to the plausibility standard affirmed by Supreme Court and Ninth Circuit precedent, not—as the government may assert—to a higher standard that may have been employed by some immigration judges in some immigration hearings in 2007. Simply put, it is not this Court's task to hold a belated immigration hearing, to attempt to recreate history. Nor is it this Court's role to decide whether it would have granted relief in Mr. Perez-Ramos' case. Unlike the hypothetical immigration judge to whom Mr. Perez-Ramos' § 212(h) and adjustment of status claim might have been assigned back in 2007, this Court does not have the discretion to make a close call in the government's favor. To the contrary, if this Court finds that relief was plausible, then Mr. Perez-Ramos must prevail.

As explained previously, Mr. Perez-Ramos was statutorily eligible for relief based on his immigration status and residence in the United States. Given Mr. Perez-Ramos' statutory eligibility for relief he had plausible grounds for relief as a matter of law. In Yepes-Prado v. U.S. I.N.S., 10 F.3d 1363 (9th Cir. 1993), which remains good law in this Circuit, the Ninth Circuit held that an immigration judge could not summarily deny a petitioner § 212(c) relief based on the petitioner's conviction for selling heroin. See id. at 1371, 1371 n.17 (noting that the immigration judge's identifying Mr. Yepes-Prado's conviction for possession of heroin for sale as an adverse factor did not discharge his responsibility to give the petition balanced consideration). In so doing, the Court explained the Congressional intent behind § 212(c) as follows:

> [B]y providing that 212(c) relief will remain available to persons such as Yepes-Prado, who have served less than five years imprisonment on account of a narcotics conviction, Congress

> demonstrated its intent that the Attorney General should consider these applications on a case by case basis, while carefully weighing all pertinent considerations, including the particulars of the petitioner's criminal conduct.

Id. at 1371.

Finding that " the IJ may have denied relief in large part on the basis that Yepes-Prado committed a crime involving drugs," the court vacated the Board of Immigration Appeal's denial of Mr. Yepes-Prado's petition for § 212(c) relief and remanded for proceedings consistent with its opinion. In so doing, the court unequivocally held that, [w]hat [the INS] *may not do* is categorically deny 212(c) relief to drug offenders who have served less than five years incarceration." Id. at 1371 (emphasis added). Undergirding the court's holding in Yepes-Prado is the quite sensible separation of powers-driven conclusion that the INS could not have categorically denied § 212(c), and its corollary for non-legal permanent residents, § 212(h) and adjustment of status, to any petitioners not statutorily barred from such relief, because "Congress could have decided to deny discretionary relief to [those petitioners], but it explicitly chose not to do so." See, e.g., id. at 1371. Because Mr. Perez-Ramos was not statutorily barred from § 212(h) and adjustment of status relief, the INS could not have categorically denied him relief. Thus, relief was a possibility. Like the petitioner in Yepes-Prado, Mr. Perez-Ramos' case would have presented an immigration judge with a tricky balancing of the positives against the negatives. Because Mr. Perez-Ramos' claim could not have been summarily dismissed, it was plausible. Accordingly, Mr. Perez-Ramos' grounds for relief were plausible as a matter of law.

Mr. Perez-Ramos intends to submit further evidence to the court of the prejudice he suffered as a result of the violation of his due process rights at his 2007 deportation proceedings.

**D. Summation**

Mr. Perez-Ramos' due process rights were violated at his deportation hearing in 2007. He suffered prejudice as a result of that due process violation. The government may not, therefore, use Mr. Perez-Ramos' 2007 deportation as a basis for its prosecution. As there is no other removal order on which the government may rely, Mr. Perez Ramos requests that this Court dismiss the indictment.

///

///

///

## IV.

## THIS COURT SHOULD SUPPRESS ALL STATEMENTS MADE BY MR. PEREZ-RAMOS

### A. The Court Must Suppress Mr. Perez-Ramos' Alleged Pre-Miranda Field Statements Because They Were Elicited as the Result of Custodial Interrogation.

The material produced thus far by the government indicates that Agent Nguyen first confronted and interrogated Mr. Perez-Ramos regarding his immigration status, approximately four miles west of San Ysidro and forty yards north of the border. This entire interrogation preceded any form of administration of Miranda rights by the agents by approximately two hours.

"The ruling in Miranda prohibits 'custodial interrogation' unless the government first gives warnings to the [subject of the interrogation]." United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1046 (9th Cir. 1990). Custodial interrogation occurs when under the totality of the circumstances the questions asked by the police are reasonably likely to elicit an incriminating response from the subject. Id. Although questions that include routine biographical information usually do not trigger the safeguard of Miranda v. Arizona, "[t]hat exception is inapplicable . . . where the elicitation of information regarding immigration status is reasonably likely to inculpate the [subject]." Id.

In United States v. Kim, 292 F.3d 971, 973 (9th Cir. 2002),[11] the Ninth Circuit noted that the following factors are to be considered in deciding whether or not a police-dominated atmosphere exists: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." Id. (citations omitted); see also United States v. Estrada-Lucas, 651 F.2d 1261, 1265 (9th Cir. 1980) (in context of custody at the border "[t]he factors to be weighed are the language used to summon him, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the pressure exerted to detain him."). The Ninth Circuit also recognizes that "question[s] implying that [the agent] suspected [the defendant] of criminal activity" can give

---

[11] In Kim, the Ninth Circuit found that a Korean woman who went to her own store, voluntarily, because an officer's visit prompted her to do so was in custody even though she was in familiar surroundings because the police "temporarily took over complete control of Kim's store creating a 'police-dominated atmosphere." 292 F.3d at 977. This combined with difficulty with English and isolation from family supported the finding that Kim did not willingly agree to submit to an encounter with the police. Id.

rise to a reasonable belief that one is not free to ignore the questions and leave. United States v. Chavez-Valenzuela, 268 F.3d 719, 725 (9th Cir. 2001).[12]

It is not necessary that an individual be physically restrained in any fashion. In Beraun-Panez, the Ninth Circuit found that an individual questioned out in an open field, who was neither held nor handcuffed nor told that he was under arrest, was nonetheless in custody for Miranda purposes. Beraun-Panez held that "[a]lthough not physically bound, Beraun-Panez was subjected to psychological restraints just as binding." 812 F.2d at 580.[13]

Here, the criteria for a police-dominated atmosphere as articulated in Kim are clearly met. The report does not state the exact words Agent Nguyen used to identify himself as a border patrol agent. Whichever words used unambiguously indicated to Mr. Perez-Ramos that Agent Nguyen was a law enforcement officer and that Mr. Perez-Ramos was in custody. Because Agent Nguyen was in uniform, carrying his gun, and Mr. Perez-Ramos was a pedestrian in an isolated area, Mr Perez-Ramos reasonably did not feel free to leave.

Concerning the extent to which Mr. Perez-Ramos was confronted with guilt, he was apprehended and immediately interrogated about his immigration status. It is, however, unclear how long the detention took place or the amount of pressure applied to Mr. Perez-Ramos since Agent Nguyen's report does not address the duration of the interrogation and detention and only uses boiler-plate language to describe Mr. Perez-Ramos's responses. Agent Nguyen confronted and interrogated Mr. Perez-Ramos regarding his suspected criminal activity of being unlawfully present in the United States without the benefit of Miranda warnings. Thus, the statements must be suppressed.

Not only did the questioning here occur in a "police-dominated atmosphere" where Mr. Perez-Ramos was isolated, the agent's questioning bore on Mr. Perez-Ramos's alienage, which is an element of the charged offense, 8 U.S.C. § 1326. See United States v. Meza-Soria, 935 F.2d 166, 171 (9th Cir. 1991). This question in such a setting carried with it implicit suspicion of criminal activity. A person, such as Mr. Perez-

---

[12] Chavez-Valenzuela involved a roadside stop of a motorist on a public street, out in the open.

[13] The police confronted Beraun-Panez with his alienage, accused him of lying and kept him separated from his co-worker in a remote rural area. Beraun-Panez, 812 F.2d at 580.

Ramos, subjected to such questioning in such a situation obviously does not reasonably feel free to leave, and thus is subject to custodial interrogation. See Chavez-Valenzuela, 268 F.3d 719, 725 (9th Cir. 2001).

In the context of an encounter between border patrol and an individual near the international border, any questioning regarding an individual's alienage falls under the rubric of custodial interrogation. Furthermore, because of the close relationship between civil and criminal immigration investigations, "[c]ivil as well as criminal interrogation of in-custody defendants by INS [agents] should generally be accompanied by the Miranda warnings." United States v. Mata-Abundiz, 717 F.2d 1277, 1279 (9th Cir. 1983).

In United States v. Gonzalez-Sandoval, 894 F.2d at 1043 (9th Cir. 1990), the defendant appeared at a local police station to provide his state parole officer with a urine sample. Id. at 1046. A second parole officer accused Mr. Gonzalez-Sandoval of being a deported alien and called the Border Patrol. Id. The Border Patrol came to the station, and without warning him pursuant to Miranda, asked Mr.Gonzalez-Sandoval where he was born and whether he possessed documents to verify the legality of his presence in the United States. Id. The Border Patrol agents then took Mr. Gonzalez-Sandoval to the Calexico Border Patrol Station. Failing to administer the Miranda warnings a second time, the agents questioned Mr. Gonzalez-Sandoval about any alias he possessed. Id. The agents ran an INS record check against Mr. Gonzalez-Sandoval's name and alias, and found Mr. Gonzalez-Sandoval's prior immigration record. Id. The Ninth Circuit found that the district court erred in failing to suppress the unwarned, prompted statements by Mr. Gonzalez-Sandoval about his name and alias. Id. at 1047.

In Mata-Abundiz, an INS agent visited the defendant in a state jail to obtain biographical information to determine the defendant's citizenship status. 717 F.2d at 1278. The agent knew about the state charges against Mr. Mata-Abundiz, and did not warn him pursuant to Miranda prior to obtaining the biographical data. Id. Afterwards, the agent made further inquiries at his office and within three hours returned to the jail to charge Mr. Mata-Abundiz with a federal immigration offense. Id. Despite the fact that the agent characterized his interrogation as pursuant to a civil investigation, the court held that the agent should have warned Mr. Mata-Abundiz as required by Miranda because the agent knew his interrogation could lead to federal charges against the defendant. Id. at 1278-1279.

Here, it is obvious that the information the agent elicited from Mr. Perez-Ramos, during the interrogation, regarding his citizenship, application for permission to enter, and use of a document was

"reasonably likely to inculpate" him. The questions served no purpose other than inculpation. They are in fact two of the four elements that they government must prove to obtain a conviction for a violation of 8 U.S.C. § 1326. Moreover, it is undisputed that Mr. Perez-Ramos was not read his Miranda rights at that point, nor advised that his answers to the agent's questions could result in federal charges against him. Therefore, statements must be suppressed.

## V.

## MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS

Defense counsel has received 113 pages of discovery at this time, however investigation of this case is not complete. Information that comes to light as a result of further investigation may necessitate the filing of additional motions. Therefore, counsel requests leave to file additional motions once investigation is completed.

## VI.

## CONCLUSION

For the reasons stated, Mr. Perez-Ramos requests this Court grant his motions.

Respectfully submitted,

Dated: May28, 2008

*/s/ Sara M. Peloquin*
**SARA M. PELOQUIN**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Perez-Ramos